## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| Gary G. Gilbert, | Court File No. _____ |
| Plaintiff, | |
| v. | |
| Gordon Dihle, William D. Nelson, Corporate Legal, LLC, a Colorado limited-liability company, and Lewis Roca Rothgerber Christie LLP, an Arizona limited-liability partnership, | **COMPLAINT** |
| Defendants. | |

_____

Plaintiff Gary G. Gilbert ("Gilbert"), through his undersigned counsel, brings the following action for damages against the above-named defendants.

JURY TRIAL DEMANDED.

### **SUMMARY**

1.      The defendants created and published false written statements about Gilbert in connection with his profession, which constitutes "defamation per se" under Minnesota law.

2.      The defendants manufactured false evidence to support a claim for alleged damages that the defendants' client[1] asserted against Gilbert in a binding arbitration filed with FINRA[2] in November 2018.[3] The defendants' actions in that regard constitute abuse of process and malicious prosecution.

---

[1] The referenced client is Capital Financial Services, Inc. ("CFS").
[2] Financial INdustry Regulatory Authority
[3] Gilbert prevailed in that arbitration on July 24, 2019, FINRA Case No. 18-04093.

3.      The defendants also conspired with each other to abuse the legal process, maliciously prosecute claims against Gilbert, and defame Gilbert.

## SUBJECT MATTER JURISDICTION

4.      Jurisdiction is proper in the United States District Court under 28 U.S.C. § 1332, diversity of citizenship.

5.      Gilbert is a resident of Minnesota.

6.      Defendant Gordon Dihle ("Dihle") is an attorney. Upon information and belief, he is a resident of Colorado.

7.      Defendant William D. Nelson ("Nelson") is an attorney. Upon information and belief, he is a resident of Colorado.

8.      Defendant Corporate Legal, LLC ("CLL") is a law firm. It is a Colorado registered limited-liability company. Upon information and belief, CLL's principal place of business is in Colorado. Dihle owns and operates CLL.

9.      Defendant Lewis Roca Rothgerber Christie LLP ("LRRC") is a law firm. It is an Arizona registered limited-liability partnership. Upon information and belief, LRRC's principal place of business is Arizona. Nelson is a partner of LRRC.

10.     In this action, Gilbert seeks damages in excess of $75,000.

11.     This Court thus has jurisdiction over this dispute under 28 U.S.C. § 1332.

## PERSONAL JURISDICTION

### *Dihle and CLL*

12.     In November 2018, Dihle and CLL instituted a FINRA arbitration for their client, CFS, against Gilbert, a Minnesota resident. That case, which was venued in Minnesota,

and the circumstances surrounding it, form the basis for this lawsuit.

13.    Dihle and CLL also defended that same client, CFS, in a FINRA arbitration that Gilbert brought against CFS for defamation. That case, which was also venued in Minnesota, involved the same facts, circumstances, and certain claims found in this lawsuit.

14.    Dihle and CLL have thus had substantial contacts with Minnesota in connection with the facts and circumstances forming the basis of this lawsuit.

15.    Dihle and CLL have also represented CFS in other cases venued in Minnesota. Dihle and CLL have thus had regular and continuing contacts with Minnesota beyond the events described in this lawsuit.

16.    Dihle and CLL are both subject to personal jurisdiction in Minnesota.

*Nelson and LRRC*

17.    The genesis of the present dispute was a proposed written Statement of Claim ("SOC") that a CFS customer threatened to file with FINRA against CFS. The CFS customer was a resident of Minnesota, and the proposed SOC called for an arbitration hearing venued in Minnesota. Under FINRA rules, a final and binding arbitration hearing on that SOC would indeed have been venued in Minnesota. CFS hired Nelson and LRRC to defend CFS in connection with that Minnesota-based customer complaint. Nelson and LRRC helped negotiate a settlement of that dispute before the SOC was filed with FINRA.

18.    In connection with that settlement, Nelson and LRRC inserted false statements into the settlement agreement, thereby manufacturing false evidence that they believed would assist CFS in its anticipated claim against Gilbert, a Minnesota resident. Nelson and LRRC had actual knowledge that CFS's claim against Gilbert would be venued in Minnesota.

19.     Nelson and LRRC have thus had substantial contacts with Minnesota in connection with the facts and circumstances forming the basis of this lawsuit.

20.     Nelson and LRRC have also represented CFS in many other cases venued in Minnesota. Nelson and LRRC have thus had regular and continuing contacts with Minnesota beyond the events described in this lawsuit.

21.     Nelson and LRRC are both subject to personal jurisdiction in Minnesota.

## FACTUAL ALLEGATIONS

22.     Gilbert was born in Minneapolis, Minnesota in October 1942. He has resided in Minnesota his entire life.

23.     In the summer of 2007, Gilbert embarked on a second career as a Registered Representative ("RR") in the investment industry. His first such job was working with an RR named Steven Knuttila at an investment firm called Questar Capital Corp. ("Questar"). He worked for Knuttila at Questar from September 2007 through June 2012.

24.     In June 2012, CFS hired Knuttila to lead its branch office in Perham, MN. CFS also hired Knuttila's team, including Gilbert.

25.     CFS is a FINRA-registered broker-dealer of investment securities. It is a wholly-owned subsidiary of Capital Financial Holdings, Inc. ("CFHI").

26.     In addition to owning and operating defendant CLL, defendant Dihle serves as General Legal Counsel for CFS. He is also the majority owner of CFHI, and serves as its Chairman of the Board and Chief Executive Officer.

27.     On June 12, 2012, Gilbert signed an Independent Contractor Agreement ("ICA") with CFS. Paragraph 3.1 of the ICA stated as follows:

Indemnification. [*Gilbert*] *shall indemnify* [*CFS*] *against any liability*, loss  or expense, including legal fees incurred by [CFS] *arising out of or in connection with (a) allegations or claims that* [Gilbert] violated federal or state securities laws or [*Gilbert*] *violated federal or state securities laws or common law standards* as to fraud or misrepresentation, or arising out of intentional wrongdoing or gross negligence by [Gilbert] in the course of activities performed on behalf of [CFS]; (b) allegations or claims against [Gilbert or CFS] that [Gilbert] violated any other laws or common law standards arising out of intentional wrongdoing or negligence on the part of [Gilbert] while performing activities for employers other than [CFS], or as an independent contractor for firms other than [CFS]; and (c) breaches of this Agreement by [Gilbert] or activities which do not comply with the written procedures and instructions provided to [Gilbert] by [CFS].

(emphasis added).

28.    In August 2018, Gilbert resigned from CFS to join LPL Financial, LLC ("LPL"). Up to the time of his resignation, Gilbert had not been the subject of any reportable customer complaints while working for CFS.

29.    On September 5, 2018, an attorney representing a customer of CFS sent an email to Nelson and LRRC attaching a proposed Statement of Claim ("SOC") against CFS. That CFS customer, who is a Minnesota resident, will be referred to herein as John Doe. In the proposed SOC, Customer Doe made various allegations of misconduct involving Knuttila and CFS. However, Customer Doe made no allegations of wrongdoing against Gilbert. In fact, Gilbert's name never appeared anywhere in the proposed SOC.

30.    On September 12, 2018, Nelson sent an email to Doe's attorney stating that he had reviewed the proposed SOC and discussed it with his client. Upon information and belief, the "client" with whom Nelson discussed the proposed SOC was Dihle. In that email, Nelson stated the following to Doe's attorney: "Mr. [Doe] was not a customer of Steve Knuttila. His registered representative was Gary Gilbert."

31.     In response, Doe's attorney wrote back the next day, emphasizing that Doe's complaint was against Knuttila and CFS – *not* Gilbert:

> My client was a client of both Mr. Knutilla and Mr. Gilbert. ***The solicitation was made by Knutilla, and Knutilla inflated my client's net worth to get him into the investment by including term life insurance***. To be clear, at no time was Mr. [Doe] an accredited investor. He is a barber, farmer, and cancer survivor who ***entrusted a significant portion of his net worth to Knutilla***. I discussed your offer with my client. His response was that ***Knutilla made a promise*** that the investment would yield substantial income and he does not understand why the firm would not make good ***on Knutilla's promise***. (emphasis added)

32.     On September 25, 2018, Nelson drafted and conveyed a settlement agreement to Doe's attorney (the "Agreement"). Nelson inserted the following prefatory clauses into the Agreement:

> WHEREAS, Claimant was a customer of CFS and its registered representative, Gary Gilbert, in approximately 2013;
>
> WHEREAS, ***Claimant alleges claims against CFS relating to violation of federal and state securities laws and common law standards by Gary Gilbert*** who was Claimant's financial advisor, CFS's supervision of same, and Claimant's investment in U.S. Energy Strategic Energy Income Fund III LP, all of which claims are denied by CFS; (emphasis added)

33.     The first of those prefatory clauses, though technically true, implies a false meaning – *i.e.*, that Customer Doe's complaint was directed at Gilbert.

34.     The second prefatory clause is absolutely false. Customer Doe ***never*** alleged any claims that Gilbert violated "federal and state securities laws and common law standards."

35.     Upon information and belief, Nelson and Dihle conspired to place that false and defamatory language into the Agreement in an effort to create fake evidence to support CFS's planned indemnification claim against Gilbert. The false language that Nelson inserted in the Agreement, not coincidentally, tracks precisely the indemnification language from

Gilbert's ICA that is highlighted in paragraph 27 above.

36.    LRRC's website includes the following information concerning Nelson's qualifications and experience:

> Nelson is a partner in the firm's *Securities Litigation practice group* and a member of the Data Protection and Cybersecurity team. *His practice is concentrated in the area of securities litigation, securities arbitration, and regulatory defense. Bill represents broker-dealers, registered investment advisors and individual securities professionals. Bill has been involved in more than <u>four hundred arbitration proceedings</u>, as counsel and as an arbitrator, before FINRA, NASD and AAA.* . . . He has represented clients in investigation and enforcement actions before the SEC, FINRA and various state regulators. . . . Bill spent six years as Associate General Counsel to a New York Stock Exchange member firm where he had both legal and business responsibilities. *He held various securities licenses including registered representative, general securities principal and branch office manager. Bill has also acted as an expert witness in securities arbitration matters*. (emphasis added)

37.    With that background and experience, Nelson had actual knowledge that the false information he placed in the Agreement was required to be reported to FINRA regulators as a "settlement of a written customer complaint" on Gilbert's regulatory record through a filing known as FINRA Form U5.

38.    CFS, at Dihle's direction, then amended Gilbert's FINRA Form U5 to disclose that it had settled a customer complaint that supposedly had been asserted against Gilbert. That was false. Once the Form U5 was filed, that false information was available over the Internet to anyone in the universe who might choose to look at Gilbert's regulatory record. In filing the false Form U5, CFS published Nelson's false statements to the universe. Nelson and Dihle both knew that CFS would be required to publish those false statements to the universe.

39.    Gilbert's new employer, LPL, became aware of the CFS-filed Form U5. LPL then required Gilbert to amend his Form U4 to conform with the U5, as mandated by FINRA.

40.     Because of CFS's report of a settled customer complaint against Gilbert, LPL insisted that Gilbert use the title "Sales Assistant" rather than "Registered Representative."

41.     On November 13, 2018, Dihle sent a demand letter to Gilbert on CFS's behalf, seeking indemnification for the settlement with Customer Doe. Gilbert retained the undersigned attorney to represent him in early December 2018. On December 12, 2018, the undersigned attorney sent a letter to Dihle responding to the demand letter. Among other things, Gilbert's counsel requested a copy of Customer Doe's complaint. Dihle never responded to the December 12th letter from Gilbert's counsel, and never provided a copy of Customer Doe's complaint.

42.     Unbeknownst to Gilbert at the time of his attorney's December 12th letter, Dihle had already commenced a FINRA arbitration against Gilbert seeking indemnification for the settlement payment to Customer Doe, FINRA Case No. 18-04093 ["1st FINRA Case"].

43.     In connection with the 1st FINRA Case, Gilbert served discovery requests on CFS, seeking a copy of Customer Doe's complaint, among other things. Dihle refused to produce it, requiring Gilbert to bring a Motion to Compel Discovery. On May 15, 2019, Arbitrator Jack Elmquist granted Gilbert's motion and ordered CFS to produce Customer Doe's complaint. Despite that order, Dihle still refused to produce Customer Doe's complaint.

44.     On July 24, 2019, Arbitrator Elmquist issued his final award, dismissing CFS's indemnification claim in its entirety. Under both the Federal Arbitration Act and Minnesota Arbitration Act, the time for CFS to seek vacation of that arbitration award has expired.

45.     Dihle's absolute refusal to produce Customer Doe's complaint, in direct violation of Arbitrator Elmquist's order requiring production, led Gilbert to conclude that the

complaint must not accuse Gilbert of any wrongdoing. After all, if the complaint had contained such allegations, Dihle would have been thrilled to produce it in support of CFS's indemnification claim. Gilbert further concluded that if Customer Doe never complained about him, then the Form U5 that CFS filed would have been false and defamatory. Accordingly, Gilbert commenced a new FINRA arbitration against CFS for defamation, FINRA Case No. 19-01377 ["2nd FINRA Case"].

46.     In the 2nd FINRA Case, Dihle again refused to produce a copy of Customer Doe's complaint; Gilbert again moved to compel discovery; and the arbitrators again ordered production. By that time, Gilbert's counsel had already obtained a copy of Customer Doe's complaint from Doe's attorney – and Dihle knew that. Only then did Dihle choose to comply with the arbitrators' order and produce a copy of Doe's complaint for the very first time.

47.     The 2nd FINRA Case went to hearing on July 7 & 8, 2020. On August 5, 2020, the three-person arbitration panel unanimously agreed that CFS had defamed Gilbert in its Form U5 filing and was entitled to damages. The final award contains the following finding:

> [Gilbert] was never the subject of the Customer's complaint. The Customer's claims were directed against [CFS] and a different broker. . . . [Gilbert] did not recommend or execute the sales of the products the Customer complained about. [Gilbert] was not informed of the Customer's claim until [CFS] requested contribution from [Gilbert] (which request was denied). [CFS] added [Gilbert] to the settlement agreement (in the Customer's underlying dispute) without [Gilbert's] knowledge or consent.

48.     Based on that finding, the arbitration panel awarded Gilbert $40,000 in compensatory damages, $40,000 in punitive damages, and $3,000 in discovery sanctions, plus ordered FINRA to amend Gilbert's Form U5 to remove the defamatory information from Gilbert's regulatory record.

49.     FINRA rules require that all arbitration awards be paid within 30 days of issuance of the award, unless the defendant moves to vacate the award in a court of law. As of the writing of this complaint, more than 30 days have passed since issuance of the award in the 2nd FINRA Case. However, CFS has neither paid the award nor moved to vacate the award. CFS thus stands in violation of FINRA's rules with respect to that award. Gilbert is now pursuing judicial confirmation of that award in a separate legal proceeding.

50.     All of the preceding allegations are realleged in each of the following counts.

**Count I**
**Defamation Per Se**
**(Against All Defendants)**

51.     The Agreement that Nelson drafted with Dihle's assistance stated that Customer John Doe "alleges claims against CFS relating to violation of federal and state securities laws and common law standards by Gary Gilbert." That statement was false (the "False Statement"). Customer Doe never accused Gilbert of any wrongdoing whatsoever.

52.     The False Statement harmed Gilbert's reputation and related specifically to Gilbert's profession, trade, or business. The False Statement thus constitutes "defamation *per se*" under Minnesota law.

53.     The False Statement was published to the general public through the Form U5 that CFS filed with FINRA. Nelson had actual knowledge that the False Statement he created, with Dihle's assistance, would be published to the general public through the Form U5.

54.     Dihle assisted Nelson in drafting the False Statement, then Dihle directed CFS to file an amended Form U5 with FINRA, resulting in publication of the False Statement to the general public.

55.     Under Minnesota law, where defamation *per se* is established, the jury is charged with determining "the amount of money Plaintiff is entitled to receive for (1) Harm to his reputation and standing in the community; (2) Mental distress; (3) Humiliation; and (4) Embarrassment. ***No evidence of actual harm is required***." MINN. CIV. JIG 50.50 "Presumed Damages" (emphasis added).

56.     Gilbert has suffered harm to his reputation and standing in the community; mental distress; humiliation; and embarrassment as a direct and proximate result of the False Statement. He is entitled to a substantial monetary award as a result.

57.     When defaming Gilbert, Dihle and Nelson were both acting within the scope of their employment at CLL and LRRC respectively. Accordingly, CLL and LRRC are legally liable for the torts of their agents under the doctrine of "respondeat superior" and other theories of secondary liability.

58.     Gilbert seeks damages in excess of $75,000 for defamation *per se* against all defendants, jointly and severally.

**Count II**
**Abuse of Process**
**(Against All Defendants)**

59.     By including the False Statement in the Agreement, Nelson and Dihle intentionally manufactured fake evidence to support CFS's anticipated indemnification claim against Gilbert (the "Fake Evidence").

60.     Dihle attached the Fake Evidence as an exhibit to CFS's indemnification claim against Gilbert. Nelson knew Dihle intended to use the Fake Evidence as evidence against Gilbert in a legal proceeding.

61.     In creating the Fake Evidence, the defendants acted intentionally, with malice, and with a conscious disregard for Gilbert's rights. The defendants' deceit at creating the Fake Evidence, plus defendants' refusal to provide Gilbert or his counsel with a copy of Customer Doe's written complaint, are evidence of defendants' malicious intent.

62.     In the absence of the Fake Evidence, CFS did not have a viable indemnification claim against Gilbert. The claim thus constituted sham litigation.

63.     Gilbert ultimately prevailed on the indemnification claim. However, he suffered damages in terms of costs and legal fees required to defend against the frivolous claim. He also suffered harm to reputation and emotional distress as a direct and proximate result of the defendants' abuse of process. Gilbert is entitled to a substantial monetary award as a result.

64.     While manufacturing the Fake Evidence and abusing the legal process, Dihle and Nelson were both acting within the scope of their employment at CLL and LRRC respectively. Accordingly, CLL and LRRC are legally liable for the torts of their agents under the doctrine of "respondeat superior" and other theories of secondary liability.

65.     Under MINN. STAT. § 481.07, if an attorney acts in a manner intending to deceive a court or a party to an action, "the attorney shall be liable to the party injured in treble damages." Under MINN. STAT. § 481.071, "every attorney . . . who shall be guilty of any deceit or collusion, or shall consent thereto, with intent to deceive the court or any party . . . shall be guilty of a misdemeanor and, in addition to the punishment prescribed by law, shall forfeit to the party injured treble damages, to be recovered in a civil action."

66.     Under the statutes quoted in the prior paragraph, defendants are liable to Gilbert for three times the damages that Gilbert suffered as a result of defendants' deceit.

67.     Gilbert seeks damages in excess of $75,000 for "abuse of process" against all defendants, jointly and severally.

## Count III
## Malicious Prosecution
## (Against Dihle and CLL)

68.     Under Minnesota law, a tort for Malicious Prosecution exists if (i) the underlying legal proceeding was brought without probable cause and with no reasonable grounds to believe the party would prevail; (ii) the legal proceeding was instituted with malicious intent; and (iii) the legal proceeding ultimately terminated in favor of the party asserting the malicious prosecution claim.

69.     A claim for indemnification must be based on a viable contract. The only contract that existed between CFS and Gilbert was the ICA. The only reference to an agreement to indemnify is found in paragraph 3.1 to the ICA, quoted in paragraph 27 above.

70.     Under the terms of paragraph 3.1, Gilbert's duty to indemnify CFS is limited to situations in which one of his customers accuses Gilbert of wrongdoing.

71.     Customer Doe never accused Gilbert of wrongdoing in Doe's written complaint. In fact, Doe never mentioned Gilbert in his complaint. Furthermore, Doe's attorney informed Nelson in an email dated September 13, 2018 that Doe's claims were against Knuttila and CFS – not Gilbert – thereby erasing any doubt.

72.     On the true facts, Dihle did not have "probable cause" to assert an indemnification claim against Gilbert, nor did Dihle have reasonable grounds to believe that CFS could ultimately prevail on such a claim.

73.     Dihle pursued the claim against Gilbert anyway, likely because Gilbert no longer

worked for CFS, making Gilbert an easy target. Dihle's malicious intent in pursuing Gilbert is evident from Dihle's decision to create Fake Evidence, with Nelson's substantial assistance, without which CFS had no claim against Gilbert.

74.    The arbitrator dismissed CFS's indemnification claim with prejudice. Thus, the legal proceeding ultimately terminated in favor of Gilbert, meeting the final element of a claim for malicious prosecution.

75.    Gilbert suffered damages in terms of costs and legal fees required to defend against the frivolous claim. He also suffered harm to reputation and emotional distress as a direct and proximate result of the Dihle/CLL's malicious prosecution. Gilbert is entitled to a substantial monetary award as a result.

76.    While maliciously prosecuting Gilbert for indemnification, Dihle was acting within the scope of his employment at CLL. Accordingly, CLL is legally liable for the torts of Dihle under the doctrine of "respondeat superior" and other theories of secondary liability.

77.    Gilbert seeks damages in excess of $75,000 for "malicious prosecution" against Dihle and CLL, jointly and severally.

## Count IV
## Civil Conspiracy
## (Against All Defendants)

78.    All defendants agreed with each other to (i) defame Gilbert; (ii) abuse the legal process against Gilbert; and (iii) maliciously prosecute claims against Gilbert. All defendants provided substantial assistance in furthering that agreement.

79.    Dihle and Nelson conspired to insert the False Statement into CFS's settlement agreement with Customer Doe, thereby creating Fake Evidence intended to benefit CFS in its

indemnification claim against Gilbert. The Fake Evidence was indeed used by Dihle in his pursuit of the indemnification claim against Gilbert.

80.     Dihle and Nelson had actual knowledge that the Fake Evidence they created was required to be disclosed on Gilbert's Form U5. Dihle directed CFS to amend Gilbert's Form U5 to disclose the Fake Evidence.

81.     As a direct and proximate result of the activities described herein, Gilbert has suffered damages and deserves significant compensation.

82.     While conspiring to harm Gilbert as described herein, Dihle and Nelson were both acting within the scope of their employment at CLL and LRRC respectively. Accordingly, CLL and LRRC are legally liable for the civil conspiracy of their agents under the doctrine of "respondeat superior" and other theories of secondary liability.

83.     Gilbert seeks damages in excess of $75,000 for "civil conspiracy" against all defendants, jointly and severally.

WHEREFORE, Plaintiff Gary Gilbert requests judgment in his favor and against all defendants, jointly and severally, for damages in excess of $75,000; treble damages under MINN. STAT. §§ 481.07 & 481.071; all costs and disbursements; and such other and further relief as the Court may deem just and proper.

Dated:  September 11, 2020

*/s/ F. Chet Taylor*
F. Chet Taylor (MN Atty No. 196071)
**ARIES LEGAL, plc**
20 Second Street NE, Suite 806
Minneapolis, MN  55413
p. (612) 722-4300
f.  (612) 722-4343
e.  Chet@AriesLegal.com

**ATTORNEY FOR PLAINTIFF**